## H. T. GARNETT, Admr., *v.* THOMAS KIRKMAN.

1. NEW TRIAL : STATUTE.—The prohibition of the statute (Hutch. Code, 876), that "no more than two new trials shall be granted to either party in the same cause," does not apply, where the record shows a bill of exceptions, taken in due form, pending the trial, to the rulings of the court upon points of evidence, and upon the rules of law declared to the jury for their direction. 26 Miss. 404.

2. INSTRUCTIONS.—It is error to charge the jury upon facts hypothetically stated in the instruction, if there be no evidence before them, tending to show their existence, although the instruction may be correct as an abstract proposition of law. 31 Miss. 464.

3. CONTRACT : FORBEARANCE.—In order to constitute a valid agreement, in consideration of forbearance of suit, it is necessary that the contract should be certain and definite in its terms, as to the period of forbearance.

4. INSTRUCTIONS : COURT'S POWER OF.—A court has not power to instruct the jury upon the weight of evidence ; but may instruct upon the tendency of evidence. 5 How. 495 ; 27 Miss. 198.

5. SAME.—Where the plaintiff's evidence does not conduce to establish his claim, it is the duty of the court, to instruct the jury to find for the defendant.

IN error from the Circuit Court of Yallobusha county. Hon. William L. Harris, judge.

Thomas Kirkman sued Thomas N. Ward, executor of Samuel Hurd, deceased, for the sum of $33,000, due upon an account stated between plaintiff and Hurd, on the 6th of March, 1843. The account was various items of indebtment, due by Mrs. Hurd, to plaintiff, prior to her intermarriage with Hurd. The defendant pleaded non-assumpsit by his testator.

Thomas N. Ward, having resigned his executorship, H. T. Garnett qualified as administrator with the will annexed.

A written agreement was made by counsel and filed, " that all special matter should be given in evidence under the declaration, in the same manner as if the proper counts were written out, to authorize the same to be admitted; the plaintiff to be at liberty to show other and different agreements, than the one named in the declaration, and at different times than therein named, and the defendant to be allowed under the general issue to insist upon all special matter in bar of the action."

In addition to the facts set out in the opinion of the court, it is necessary to set out the following facts:

HURD TO KIRKMAN.

TROY, September 30th, 1843.

DEAR SIR,—Yours of the 14th came to hand the 23d. . . . . . It is a matter of sincere regret to me, that you should be put to trouble on our account, but in the present position of things, I cannot prevent it. I am giving my whole energy to the business of the estate; and will do all that industry and economy can accomplish towards diminishing its indebtedness.

There is now no probability that the crop will be sufficient to pay the full amount of your note in bank; for drought has greatly cut it short on upland, and now excessive rains threaten as much mischief to the lowlands, besides injuring and wasting the cotton already open.

What I can pay I will; and if you wish it, send you a draft for the probable sum of the net proceeds, expenses, &c., deducted, say $2000 or $2500. . . . . . .

I received a reply from my commission merchants refusing to accept my bill, and I applied to one here, who would not accept

my bill even to get my business. There seems, therefore, a necessity that you should a little longer befriend us, by arranging the protested bill, and add the amount of it to the mammoth debt we owe Sam and you, as was the understanding between you and me last year with respect to this same debt.

Very respectfully, yours, &c.,

S. HURD.

SAME TO SAME.

PINE HILLS, Oct. 12th, 1843.

DEAR SIR: Mary is removed from us by death. . . . . . . She made a will in the early part of her sickness, directing that her part of the estate should remain connected with mine, and debts paid off with the proceeds of the whole by its annual income. In case the creditors should not grant sufficient indulgence for that, she directs her executor to sell property to pay debts. After the debts are all satisfied, the net income of her half of the estate for three years is to be funded, for the benefit of Mrs. Pope during her life, and after death for Jane; the residue of her property she devises in accordance with a long-cherished and favorite plan of hers of Christian benevolence. In the meantime, until such fund shall be created, and become productive, she directs her executor to pay an annuity of $300 to Mrs. Pope. She has nominated me as her executor. Before deciding whether or not to undertake the executorship, I wish to confer with you respecting our debt. You know the condition of the estate. It owes no debts, except some little accounts, save to you. I owe no debts of any magnitude; but the debt to you is very large, and, if pressed to collection, would sweep nearly or quite the whole estate. If five or six years can be given, and crops should be good, and the market favorable, the debt may be extinguished, and property enough retained to provide a support for Mrs. Pope and myself. The land is now cleared, and the effective force increasing; the establishment is upon an economical plan, and if money can be made by planting, we can make it. Now, I desire such arrangements made that I can have time, and I wish the arrangements secure from any material change by the death of any concerned. Otherwise, after two or three years' trial, I might see the whole estate sacrificed, and none of Mary's wishes accom-

plished.  I am willing to give my time and energy to carry out her wishes, and provide for her sister, provided there is a prospect of success; but if that cannot be secured, is it not better at once to let the property pay the debts?  So I am inclined to think. The debt might be divided into instalments, and notes given accordingly, drawing interest.  A lien upon the estate would make the debt to Jane as safe as any she has.  Is it replied, it is not according to the will?  The same court which has authorized other deviations from the letter might authorize this.  With respect to Jane, had her mother lived, our house would have been her home; then she would have returned from schoool, not as a guest, but as a member of the family—as a child.  Now, what my house would have been, had Mary lived, I desire it still to be. . . . . .

Yours, respectfully,

S. HURD.

PINE HILLS, Nov. 16th, 1843.

DEAR SIR: Yours of the 25th ult. was duly received.  Having all confidence in your friendly disposition towards the representative of our deceased Mary, I take the liberty of calling your attention more particularly to a suggestion in my last letter.  I propose that our debt to you shall be divided into instalments (say six), such that the income of the estate will probably be adequate to meet them annually.  I think you will find upon examination that this will be safe for you, and advantageous to Jane. . . . . . . . . . . But as you propose to make our debt in that half of the estate which is to be loaned to individuals to be paid "semi-annually," such a method of computing interest requires a business more profitable than planting. . . . . . . .

S. HURD.

SAME TO SAME.

TROY, May 15th, 1845.

DEAR SIR: I propose to sell you the interest of Mary and myself in the Mississippi River lands at a price to be set by Henry Anderson, or some other judge of lands.

Mrs. Pope's lawyers, Lucas, Watson, and Clapp, at Holly Springs, suggested, as a basis for a compromise between Mrs. Pope and myself, that I acknowledge the $10,000 claim, and she relinquish all claims

under the will.   I told them that perhaps I might accede to their proposition somewhat modified, but your consent and approbation were necessary to any such arrangement.   In making a compromise of that sort, it would be necessary to put the debt to you into instalments, for the payment of each of which I would give a note, with a deed in trust or mortgage upon the negroes of the estate, each note secured by a certain number of negroes. . . . . . .

S. Hurd.

A letter, written by S. Hurd to R. S. Finlay, dated April 26th, 1846, was also read to the jury, in which he states, that he desires all his slaves sent to Africa; that they are now working to pay a debt; that Mrs. Hurd also "willed her slaves to Liberia; but if my life is cut short, her debts will take most of them."

The will of Mrs. Hurd, and the marriage contract of Mary Smith and Samuel Hurd, were read to the jury.   It was admitted that the plaintiff, by the will of Smith, former husband of Mrs. Hurd, was appointed executor and guardian of Smith's only child, Jane.   Plaintiff read the deposition of B. B. Barker, who proved that the plaintiff acted as the agent of Mrs. Smith from the death of her first husband until her marriage with S. Hurd.   I made out an account between Mrs. Hurd and Thomas Kirkman some time after her marriage to Hurd.   It was made out from memorandums. Mr. Hurd frequently called to inquire into its progress, and furnished some of the memorandums from which it was made out. When the account was finished, I handed it to Mr. Hurd, and he made no objections to it.   The account exhibited to me is in my handwriting up to a balance struck of $25,958 46.

J. B. Lorance, a witness for Kirkman, stated that some time before Hurd's death, he, witness, lived with Hurd, and in conversation with him, which took place in the fall of 1845, Hurd said he had been to Florence, Alabama, to see Kirkman, to get him to change the payments of interest on the debt due Kirkman, from semi-annual to annual payments, and he, Hurd, further said that the agreement between him and Kirkman was, that he was to pay Kirkman's debt out of the crops growing on the plantation, by working Mrs. Hurd's hands, and that the debt was twelve or fifteen thousand dollars.   Argus Johnson, a witness for Kirkman, had a

conversation with Hurd, in the year 1844 or 1845, in relation to the debt due Kirkman, when Hurd said he was paying a large debt to Kirkman out of the proceeds of the crops he was making on the plantation; and this conversation took place about a year before Hurd's death.

Furguson, a witness for Kirkman, had a conversation with Hurd before his death. Hurd told witness the plantation would be kept up for several years; that he owed Kirkman, guardian for James Smith. He said that it would take from six to ten years to pay it, and during that time witness would remain on the place in the capacity of an overseer.

There was other testimony, consisting of letters abstracted, in the opinion of the court not relating particularly to the assumpsit of Hurd. Furguson was the only additional witness introduced upon this trial who did not testify in the former trial, reported in 27 Miss. Rep. 824.

It is unnecessary to notice the instructions, except those set out in the opinion of the court.

The jury found a verdict for the plaintiff.

*Watson* and *Craft*, for plaintiff in error,

Insisted, 1st, that the statute, Hutch. Code, 876, section 73, which declares that " no more than two new trials shall be granted to either party in the same cause," was not applicable in this cause. The statute has no application to errors of the court below, made apparent upon the face of the record, by bill of exception, filed during the progress of the trial. *Lindsay* v. *Henderson*, 5 Cushm. 505; 10 Yerger, 499; Meigs, 163; 3 A. K. Marshall, 1133; 7 Humph. 513; 1 Humph. 16.

2d. As to the liability of Hurd upon a promise made by him to pay the debts of his wife contracted *dum sola*, upon consideration of forbearance, the following authorities were cited: 2 Kent's Comm. 144; 1 Comstock, 453; 13 S. & M. 607; 5 Cushm. 825; 13 S. & M. 451; 14 Ib. 105; 2 Call. 376; 5 Ib. 117; 1 How. U. S. R. 134; 3 Ib. 413.

3d. The court should have instructed the jury " that in this case the plaintiff has proved nothing which conduces to show his right to recover, and that the jury must find for the defendant."

1 Watts, 433 ; 11 Vermont, 621 ; Graham on New Trials, 278 ; 9 Leigh, 30.

*Sale* and *Phelan,* for defendant in error.

1st. As to the statute granting no more than two new trials, 26 Miss. 404; 5 How. Miss. 495; 1 S. & M. 412.

2d. As to Hurd's liability upon an assumpsit to pay debts of his wife contracted *dum sola,* made during coverture, upon consideration of forbearance, Chitty on Con. 151, 565; 7 Term Rep. 194; 1 Taunton, 212; 2 Amer. Lead. Cases, 137, 138, 148, 159, 160; 2 Saund. Pl. and Ev. 572; 1 Rob. Pr. 284; Chitty on Con. 442; 1 Starkie Ev. 515.

3d. It was not error to refuse the instruction asked by the defendants in the court below, "that there was no evidence which conduced to show the right of recovery in the plaintiff, and they must find for the defendant." 5 How. Miss. 495.

HANDY, J., delivered the opinion of the court.

This case has been twice before this court. Upon the last decision of it, which is reported in 27 Miss. 824, it went back to the Circuit Court for a new trial, and a verdict and judgment were again rendered for the plaintiff in the action. Exception was taken to the rulings of the court pending the trial, and a motion was also made for a new trial, which was overruled and exceptions taken thereto ; and upon those exceptions the case is again brought here.

Before proceeding to examine the merits of the case as it is now presented, it is necessary to consider a preliminary point raised in behalf of the defendant in error.

It is insisted, that inasmuch as two new trials in the case have already been granted to the plaintiff in error, he is debarred by the Statute of 1822 (Hutch. Code, 876, § 73) of all right to another trial, though the judgment be erroneous, and that therefore this court cannot now reverse the judgment and award a new trial. This position would be correct if the case stood here solely upon the alleged error in overruling the motion for a new trial and the exception taken thereupon. But the record shows a bill of exceptions, taken in due form, pending the trial, to the rulings of the court, upon points of evidence, and upon the rules of law declared to the

jury for their direction. It has been held by this court, that the prohibition of the statute does not apply to such a case, and we have no doubt but that where erroneous rulings are made by the court, and exceptions duly taken thereto pending the trial, it is competent for the party aggrieved to bring the case to this court, and have it examined, and if found to be erroneous upon the points excepted to, to have it reversed, and a new trial awarded without regard to the number of trials which may have been had. *Ray* v. *McCary,* 26 Miss. 404.

When the case was before this court, on the previous occasions, it turned mainly if not entirely upon the question, whether Hurd, the testator of the plaintiff in error, had become individually liable to pay the debt due by his deceased wife, whose executor he was, in consideration of forbearance by the defendant; and the controversy was, whether he was bound for the debt by virtue of alleged promises made by him after his wife's death, in reference to the provisions of the Statute of Frauds; and it was determined that the evidence was not sufficient to create an individual liability incurred after the death of his wife. Upon the last trial, which is the one now before us for review, no additional evidence was adduced tending to show a liability against Hurd individually, in virtue of any promise as executor of his wife; and in that aspect of the case, the former decisions are conclusive against the right of the plaintiff to recover on the last trial.

But on that trial the right of recovery appears to be placed upon a ground entirely different. It appears that the declaration was in assumpsit upon an account, stated by Hurd in his lifetime; but a written agreement was made by the counsel and filed, "that all special matter should be given in evidence under the declaration, in the same manner as if the proper counts were written out to authorize the same to be admitted, the plaintiff to be at liberty to show other and different agreements than the one named in the declaration, and at different times than therein named; and the defendant to be allowed under the general issue to insist on all special matter in bar of the action." Under this ample and indefinite agreement, it appears that the case was tried as upon a count upon a promise by Hurd, in the lifetime of his wife, to pay her debt to the plaintiff, in consideration of forbearance to sue him and

his wife upon the debt. The particulars of this alleged contract were not stated in any way, by way of pleading in the cause, and the particular ground upon which the right to recover was placed, only appears by the instructions to the jury, given at the request of the parties.. Upon this point, the court gave the following instruction at the instance of the plaintiff, to which the defendant excepted.

"If Mrs. Smith owed Kirkman this debt when Hurd married her, by her marriage Hurd became liable for the debt, and could have been sued by Kirkman, for the same jointly with his wife, at any time during her life, without any other consideration or promise; but if the jury believe that during the life of Mrs. Hurd, there was an agreement between Hurd and Kirkman, by which Hurd agreed to pay the debt if Kirkman would forbear to sue him, and that Kirkman did so forbear: this was a new and original contract between them, not required to be in writing, and upon which Hurd became personally liable."

This instruction involves the whole merits of the case now necessary to þe considered, and its propriety depends not so much on its abstract correctness, as upon the question whether there was any evidence before the jury tending legitimately to the conclusion, that there was a contract between Hurd and Kirkman, in the lifetime of Hurd's wife, by which Hurd agreed to pay the debt, in consideration that Kirkman would forbear to sue him. Let us then examine the evidence, to ascertain, whether or not it conduces to show such a contract.

It appears that Hurd was married to Mrs. Smith, in the year 1842, and that she died in October, 1843, and the account due by Mrs. Smith to Kirkman, which is the foundation of the plaintiff's claim, was first received by Hurd on the 6th March, 1843, at which time he made a written memorandum upon it that he had received it and "found it to be correct." After this account and memorandum were read to the jury, the plaintiff read in evidence sundry letters written by Hurd to Kirkman, which are the same which were in evidence on the two former trials.

The first of these letters bears date May 5th, 1843, and the second on the 15th July, 1843, in which he speaks in relation to a bill for $4460 20, which Kirkman had paid for him, and of which

he had just been advised, and promising to apply the proceeds of the then growing crop, to the payment of the amount. This has no connection with the account on which this suit was founded, as the indebtedness accrued after that account was stated and acknowledged by Hurd, and these letters contain nothing having the most remote bearing upon the account against Mrs. Smith.

The next letter is dated 18th of August, 1843. It commences by saying, "As I have already promised you, all the surplus income of our estate shall go into your hands, and the proceeds of the growing crop are intended to meet the draft of which you wrote me by Mrs. Pope" (the draft referred to in the previous letters); but expressing his fears that he would be unable to make such a bill as Kirkman desired to pay the draft, and saying, that he then would write to his merchants to ascertain whether they would accept such a draft. Nothing further is said in this letter about pecuniary matters, and it is manifest, that no reference whatever is made in the expressions above quoted to any agreement between them for the payment of the account in consideration of forbearance.

The next letter bears date 30th September, 1843, and will be found at length in 13 S. & M. 601. It acknowledges the receipt of a recent letter from Kirkman, expresses regret that he should be put to trouble on account of Hurd and wife, stating that he was using every effort to diminish the indebtedness of the estate, but that the probability was, that the growing crop would be insufficient to pay Kirkman's note in bank, which it is probable was given by way of arranging Hurd's draft, spoken of in the first letters. He then states, that he had received a reply from his commission merchants, refusing to accept his bill, and that he was unable to obtain another acceptance, and concludes by saying, "there seems therefore a necessity that you should a little longer befriend us, by arranging the protested bill, and add the amount of it to the mammoth debt we owe Jane and you, as was the understanding between you and me last year, with respect to this same debt." He here speaks of Kirkman's befriending them further, by arranging the protested bill, and adding it to the debt already due, as was the understanding between them last year with respect to this same debt. The understanding here alluded to, cannot with any propriety be considered to be a contract for forbearance, but that the protested bill

should be added to the debt previously due. What was the agreement, if any existed, in relation to the previous debt the letter does not tend to show, and it has already been settled by this court, in the first decision, that this letter would have been insufficient to support an action against Hurd, if he had been sued alone during the life of Mrs. Hurd. 13 S. & M. 608.

The next letter bears date 12th October, 1843, and was written immediately after Mrs. Hurd's death. He states the disposition made by her will of her property, that her part of the estate should remain connected with his, and the debts paid off by the proceeds of the whole of its annual income; and, in case the creditors should not grant sufficient indulgence for that, she directs her executor to sell property to pay debts. After stating other provisions of the will, not material to be mentioned, he says, "Before deciding whether or not to undertake the executorship, I wish to confer with you respecting our debt. You know the condition of the estate. It owes no debts, except some little accounts, &c., save to you. I owe no debts of any magnitude. But the debt to you is very large, and if pressed to collection, would sweep nearly or quite the whole estate. If five or six years can be given, and crops should be good, and the market favorable, the debt may be extinguished, and property enough retained to provide a support for Mrs. Pope as well as myself. . . . . . . Now, I desire such arrangements made that I can have time, and I wish the arrangements secure from any material change by the death of any concerned. Otherwise, after two or three years' trial, I might see the whole estate sacrificed, and none of Mary's wishes accomplished. I am willing to give my time and energies to carry out her wishes, provided there is a prospect of success. But if that cannot be secured, is it not better at once to let the property pay the debts? So I am inclined to think. The debt might be divided into instalments, and notes given accordingly, drawing interest."

This letter, so far from tending to show the existence of any agreement for indulgence, by Kirkman, that could be a legal consideration for an individual liability on the part of Hurd, is entirely irreconcilable with such an idea. It was written in about seven months after the time when the account against Mrs. Hurd had been received by Hurd, and was acknowledged to be correct.

There is not the least evidence tending to show that any agreement for forbearance was made with Hurd previous to the time when the written acknowledgment upon the account was made by him. Even if it could be supposed that such an agreement was made, it must have been not earlier than July, 1842, after which time Hurd was married. And taking into consideration the circumstances and available means of Hurd, arising from his planting, which appears to have been his only resource, it is altogether improbable, that he would have contracted for indulgence, upon so large a debt, for only one year; because it is clear, that he looked to the proceeds of his crops to pay the debt, which, for one year, would have been wholly insufficient; and that he considered that unless he could get indulgence for several years, it would be better to let the property be sold to pay Kirkman's debt. Much less could it be supposed that after March, 1843, he would contract to become personally bound to pay the debt, in consideration of forbearance for no longer time than the 12th October following; for such an indulgence would have given him no benefit of his cotton crop, the only means by which he expected to pay the debt, and which he shows himself anxious to realize for that purpose. And yet, it is manifest, from the tenor of this letter, that if any agreement for forbearance was made, the time of forbearance had elapsed when the letter was written. The probabilities, therefore, arising from the circumstances in which the parties were placed, are decidedly against the presumption that any contract for forbearance was made previous to the date of this letter, and in the lifetime of Mrs. Hurd.

The terms and general tenor of this letter go clearly to negative the existence of such a contract. He first speaks of Mrs. Hurd's will, directing that the property should be kept together, and that the debts, of which Kirkman's was the only one of any considerable amount, should be paid from the annual income; but if the creditors would not grant sufficient indulgence for that, that the property should be sold to pay the debts. This serves to show that no contract for indulgence was considered either by Mrs. Hurd or Hurd, to be in existence. He says, he wishes to confer with Kirkman respecting "our debt" (the debt of the estate), before deciding whether he would become executor under the will of his wife, and

Garnett, Admr., *v.* Kirkman.

among other things says, "The debt to you is very large, and if pressed to collection, would sweep nearly or quite the whole estate." This again shows that there was then nothing to prevent Kirkman from pressing the debt to collection. He then proposes that five or six years be given to pay the debt, and states that he desires such arrangements made as to give him time, and to be secure from any material change by the death of any concerned, by a certain and reliable contract. In all this he recognizes the operative force of the debt of Kirkman, makes no reference whatever to any previous contract for indulgence, which must in all probability have been then in force, if it ever existed, and makes no application for further indulgence. It is also worthy of observation, how careful he was to require that the arrangements for indulgence then proposed, should be made in such a manner, as to be secure from any change by death of parties, which shows that when he made contracts and incurred liabilities for indulgence, he was aware of the necessity of having them in a certain and available form.

But this letter furnishes another reason of great force to show that no such contract for forbearance existed as is alleged. That is the statement, that before deciding whether he would become executor, he wished to confer with Kirkman, respecting the debt due him. It is scarcely possible that if he was under a personal liability to pay the debt, he would have hesitated to keep the control of the property which would be his security, or that he would have permitted it to go into the hands of another person, whereby it might with difficulty be subjected to the debt.

Whether therefore we consider the spirit and tenor of this letter or its expressions, we think it clear that it contains nothing, from which the conclusion could be properly drawn, that a contract for forbearance ever existed between the parties concerned, but that its tendency is quite the reverse.

The next letter is dated 16th November, 1843, in which he again calls his attention to the proposition in the last letter, to divide the debt into six instalments, so that it might be paid by the annual proceeds of the crops, and urges this as a safe arrangement. Nothing is said in this letter recognizing the existence of the alleged contract, or at all having any reference to it.

The next letter, of 26th November, 1843, makes no reference whatever to the business transactions between the parties.

The next letter, of 15th May, 1845, and that of September 16th, 1845, relate to other matters than the debt due to Kirkman, and have no bearing upon that debt. The same may be said of the letter of February 6th, 1846.

A letter, dated 28th April, 1846, written by Hurd to one Finlay, was then read, in which he stated that he wished all his slaves to be sent to Africa in a few years; that they were then working to pay a debt; also a copy of the will of Mrs. Hurd, containing the substance of what was stated in the letter of Hurd, but nothing further material in this suit; also the marriage contract entered into between Hurd and his wife previous to their marriage in July, 1842, which does not affect the question in issue; also the will of Hurd, which is immaterial.

The plaintiff then introduced the deposition of one Barker, who stated, that some time after the marriage of Mr. and Mrs. Hurd, in July, 1842, he made out the account read in evidence by the plaintiff; that whilst he was making it out, Hurd called several times to inquire about it, and furnished some data, &c., and when finished, he handed it to Hurd, who made no objection to it; that Kirkman acted as Mrs. Hurd's agent before her marriage to Hurd.

The deposition of Lorance was next read, who testified that he was acquainted with Hurd from the year 1844 until his death, and resided with him during that period; that upon several occasions he heard him speak of his indebtedness to Kirkman, and particularly that he recollected a conversation in the fall of 1845, after Hurd had returned from a visit to Kirkman in Alabama, in which Hurd stated that the object of his visit was to get the interest on the debt changed, from semi-annually to annually, and that the agreement between him and Kirkman was, that he should pay the debt out of the proceeds of the crops grown on the plantation worked by the hands of Hurd and Mrs. Hurd; that he never heard Hurd say anything about Kirkman's indulging him further than this.

The evidence above detailed was all before the court upon the trial which was last under review in this court.

The plaintiff then introduced one Ferguson, who testified, that he

was overseer on Hurd's plantation in December, 1845, and remained there until Hurd died in June, 1846; that he told witness, a few days before his death, that he wished him to remain on the place; that he would die in a few days, but that he had given his executor written directions as to the management of his business; that he did not recollect that Hurd spoke of but one indebtedness, and that was due to his step-daughter, Jane Smith, for whom Kirkman was guardian, and he said it would take from six to ten years to wind up the business, and that witness could have a home on the place all that time; that Kirkman was not pressing for the money due to him as guardian; that Jane Smith would not be of age for six years, and that time would probably be given on the debt. No amount was specified as due Jane Smith.

The evidence adduced on the trial has been thus presented in detail, in order that it may be ascertained whether there was any evidence from which the legal conclusion could be properly drawn that Hurd had promised to pay the debt to Kirkman during the lifetime of his wife in consideration of forbearance, and that the forbearance was accordingly given. After a careful scrutiny of all the evidence in the record, we think it manifest that there is no evidence legitimately conducing to such a conclusion. It is not contended that there was any direct evidence of such an agreement; and if it depends upon inferences from facts, it is clear that all the circumstances and probabilities appearing from the relations of the parties, as disclosed by the letters of Hurd, go to negative the existence of the alleged agreement. All those letters are silent as to any such agreement, which would be unaccountable if it had existed, especially when we consider that it must have been but recently made. If forbearance was given under the assumpsit of Hurd, it must have been for a period altogether inadequate to his purpose; for when he does apply for indulgence, which is immediately after his wife's death, he not only makes no reference to the forbearance, which had previously been extended as is alleged, but asks it for a much longer time than was given under the supposed previous arrangement, and without which it is clearly shown that indulgence was neither desirable nor beneficial to him. In addition to this, if forbearance was given in consideration of Hurd's assumpsit, it is unaccountable that persons of such intelligence as

Hurd and Kirkman, should, in a matter of so much importance, take no evidence of the contract as a security to each party, for the benefit contemplated by them respectively; and we perceive that when Hurd made the propositions for indulgence contained in his letters, he was alive to the necessity of a certain and reliable contract, to be secure from the contingency of the death of any of the parties concerned. It is also a circumstance of much force, in judging of the probability of the alleged contract, that in neither of the trials that have been had, has the plaintiff's claim been placed on the ground now assumed. This might have been accounted for if there had been any new discovery of evidence since the former trials. But the evidence is the same, with the exception of that of Ferguson, which does not touch the point, as was introduced on the previous trials. If the alleged contract was made, the plaintiff must have known it, and the inquiry naturally arises, why was not the contract relied upon on the previous trials, when it was really a legal right of the plaintiff, if it existed, and when the nature of the defence rendered it so essential that it should be relied on? This consideration gives much weight to the other circumstances in the case, going to show that the alleged contract never existed.

But it was incumbent on the plaintiff to show the alleged contract. If it was entered into, in order to be valid in law, it was necessary that it should be definite and certain as to the terms of forbearance, for otherwise it was without consideration to the defendant. When we look to the evidence, the inquiry immediately arises, what were the terms of the contract? what was the period of forbearance? was it a mere gratuitous indulgence, or was the forbearance a legal right which Hurd could have enforced? All these things are essential in order to create a liability in consideration of forbearance; and it is clear that the record contains no evidence upon these points, and the mind could not possibly come to any conclusion upon any of them, except that founded on mere vague conjecture; for there is nothing in the evidence that will support the legal inference that the essentials of the contract existed, because from it, it is impossible to say what were its terms. The contract of forbearance is necessarily a special contract, and it would be in violation of all principle and authority to maintain an action on such a contract, without proof of a certain and satisfactory charac-

ter of its terms.  The case is to be considered as if all the particulars necessary to constitute a special contract for forbearance, and a promise founded thereon, were formally stated in a declaration ; and if such were the case, it could scarcely be said that there is any evidence at all sufficient to show any particular contract. *Montgomery* v. *Dillingham*, 3 S. & M. 647.

The only other question necessary to be considered is, whether it was error to refuse the following instruction asked in behalf of the defendant.

" That in this case the plaintiff has proved nothing which conduces to show his right to recover, and that they must find for the defendant."

If the case could be regarded as in any respect standing on the ground on which it was placed, when it was heretofore before this court, it is plain that the evidence was insufficient, in any way in which it could be viewed, to maintain it.  But it is admitted, that the right to recover depended entirely on the last trial, upon the assumpsit of Hurd in consideration of forbearance ; and the instruction under consideration presents the question, whether it is competent and proper in any case, for the court to declare that the evidence, in any view in which it can be legally considered, is insufficient to maintain the action.  This is not an open question in this court.  It has been fully and emphatically decided in *Perry* v. *Clark*, 5 How. Miss. 495, upon grounds that meet our entire sanction. The rule there recognized is, that although the court has not the power to instruct the jury upon the weight of evidence, yet it has the power to judge of the tendency of evidence, and that the power is essential to the administration of justice, and is necessarily incident to the province of the judge.  It is said to be a power which should be exercised with the greatest possible caution, and only in cases where there can be no room for doubt.  But when the evidence wholly fails to make out the plaintiff's case, and when it does not tend in any just legal view to establish it, it is the duty and province of the court so to instruct the jury.  This rule is also recognized in *Frizell* v. *White*, 27 Miss. 198. Thus when the plaintiff's evidence, giving its full weight, and drawing from it every legal inference of which it was susceptible, and which the jury might have drawn, is not sufficient in law to maintain the action, the court

is bound, upon the motion of the defendant, to instruct the jury to find as in case of nonsuit.

If this rule be correct, it was the duty of the court, under the view we have above taken, of the nature and character of the evidence, to grant this instruction, because there was a total failure of evidence, in any proper legal view of it, to maintain the action.

It follows, from these views of the case, that the judgment is erroneous; and it is therefore reversed, and the cause remanded for a new trial.

FISHER, J., having been of counsel in the court below, and on the first trial in this court, took no part in this decision.

An application was made for a reargument of this cause, which was refused.

[This case was decided at the April Term, A.D. 1856.]